IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSPEH DIVISION

TONY RAY KING,                  )
                                       )
           Petitioner,       )
                                       )
vs.                          )       Case No. 19-00015-CV-SJODS
                                       )
STANLEY PAYNE, Warden,     )
Eastern Reception, Diagnostic, and  )
Correctional Center,            )
                                       )
          Respondent.    )

ORDER AND OPINION (1) DENYING PETITIONER'S AMENDED PETITION FOR
WRIT OF HABEAS CORPUS, (2) DECLINING TO ISSUE A CERTIFICATE OF
APPEALABILITY, AND (3) DISMISSING MATTER WITH PREJUDICE

Pending is Petitioner Tony Ray King's Amended Petition for Writ of Habeas
Corpus filed pursuant to 28 U.S.C. § 2254. Doc. #3. For the following reasons, the
Court denies Petitioner's Amended Petition for Writ of Habeas Corpus and declines to
issue a certificate of appealability.

## I.      BACKGROUND

The underlying facts were summarized by the Missouri Court of Appeals:

> In late 2011 and early 2012, King lived with his seven-year-old son,
> J.L., in a mobile home in rural Harrison County. At the time, King was
> involved in a custody battle with J.L.'s mother, Mira Huffman. In October
> 2011, King told Huffman she would never see her son again.

> In September or October 2011, a friend of King's saw King slap or
> hit J.L. Starting on November 16, 2011 and continuing into January 2012,
> J.L.'s teacher, principal, and school counselor began noticing several
> suspicious bruises, scratches, and sores on J.L.'s head, face, and neck.
> J.L. and King gave differing explanations for what caused the injuries. On
> January 6, after one of King's friends observed numerous bruises and
> injuries on J.L., King told the friend that J.L. had gotten kicked off the bus
> and that he was going to "beat [J.L.'s] butt" because of it. During this
> same time, J.L. had significant absenteeism from school. From mid-
> November to January 11, 2012, J.L. was in school only 15 of 32 school
> days.

On January 10, 2012, King called J.L.'s school and said that J.L. would be living with King's sister in another town and transferring to a different school. That same morning, King went to visit Robert Hunter. As King and Hunter talked outside, Hunter looked into the cab of King's pickup and saw a small person lying on the passenger seat. The figure, which appeared to be the same size as a seven-year-old child, was completely covered with a blanket except for his hand. When Hunter asked King why his son was with him, King said that he was taking J.L. to his sister's house. Hunter did not see the child move during the entire conversation. That same day, King told another friend, Eric Bridger, that J.L. was staying with King's sister. That evening, King's sister called Bridger trying to find J.L. King's sister told Bridger that she had spoken with King, but King would not tell her where J.L. was.

Between January 9 and January 11, 2012, two men, David Baker and Tanner Henry, were scrapping metal on the property on which King's mobile home was located. While Baker and Henry saw King occasionally over the course of those three days, they never saw J.L., and King did not talk about J.L. On the morning of January 11, 2012, King told Baker and Henry that J.L. was sleeping in the mobile home and that he needed to go get a tire repaired. King asked them to tell J.L. where he had gone if J.L. woke up.

About 10 to 15 minutes after King left, Baker noticed a lot of smoke coming from the vicinity of King's mobile home. When Baker arrived at the mobile home, he found King, with a sweatshirt wrapped around his face, apparently trying to get inside. King said that he had lost his phone, so Baker called 911. King then told Baker, "My son's in there." When Henry arrived at the mobile home, he and Baker repeatedly asked King where his son was. King simply pointed in the general direction of the flames. While Baker and Henry tried to get into the mobile home and called out to J.L., King knelt in the yard and then calmly sat in his pickup truck. King then futilely rammed his truck into the frame of the mobile home several times. Baker and Henry observed that he did not speak or display any emotion while doing this.

After a deputy arrived, King became emotional and began to cry. When the deputy asked King where his son might be located in the mobile home, King said that J.L. was in a bedroom in the southeast corner. King then broke out a window in the home, but it was not possible to get in the window due to the smoke and fire. After putting out the fire, the firefighters found J.L.'s body in his bedroom at the east end of the mobile home. Later that day, King went to the home of Bridger and Bailey Hutchins and said that he had two gas cans that he needed to get rid of. While there, King "didn't seem really upset." An investigator with the Missouri State Fire Marshall's office found no accidental causes for the fire. He was unable to determine a specific cause, but he noted that the fire progressed faster than he would have expected. He did not find

evidence of any accelerants but, given the short time frame and the amount of damage from the fire, he suspected that accelerants had been used.

Dr. Keith Norton performed an autopsy on J.L. Norton found bruises along the right side of J.L.'s chin line and jawline. The bruises appeared to be recent, as if they had occurred within the past 24 hours. J.L. had recent bruises just above and below his right collarbone. According to Norton, children are not likely to injure this part of their body in the course of play. J.L. had bruises on his right arm that were consistent with his arm having been grabbed very hard. J.L. also had injuries to his internal organs that were consistent with blunt trauma.

Additionally, J.L. had bruises on his neck that were consistent with his having been strangled or choked. There was bruising in the tissues around and behind J.L.'s larynx. J.L. had no soot in his windpipe or lungs. Norton concluded that J.L. was dead before the fire started. Norton concluded that J.L. did not die from smoke inhalation but, rather, from a lack of blood flow to the brain "probably" due to manual strangulation. Toxicology results confirmed that carbon monoxide was not the cause of J.L.'s death.

The State charged King as a prior and persistent offender with first-degree murder, second-degree arson, and felony child abuse. A jury found him guilty, and the court sentenced him to life in prison without the possibility of probation or parole for the murder and terms of fifteen years in prison each for the arson and abuse counts, to be served consecutively.

Doc. #17-12, at 3-6. The Missouri Court of Appeals affirmed Petitioner's convictions and sentences. *State v. King*, 453 S.W.3d 363 (Mo. Ct. App. 2015), *abrogated in part by Hoeber v. State*, 488 S.W.3d 648, 657 (Mo. banc 2016); *see also* Doc. #17-6.

Petitioner filed a *pro se* motion for post-conviction relief in the Circuit Court of Buchanan County (hereinafter, "motion court"). Doc. #17-7, at 13-27. The motion was later amended when counsel was appointed. *Id.* at 32-66. After an evidentiary hearing was held (Doc. #17-8), the motion court denied Petitioner's motion. Doc. #17-7, at 288-342. Petitioner appealed the motion court's decision to the Missouri Court of Appeals, which affirmed the motion court's decision. Doc. #17-12. In November 2018, Petitioner filed a Petition for Writ of Habeas Corpus in the United States District Court for the Eastern District of Missouri. Doc. #1. Shortly thereafter, he filed an Amended Petition (Doc. #3) wherein he asserts the following grounds for relief:

> (1)     Petitioner was denied his rights to due process, a fair trial, and proof beyond a reasonable doubt when the trial court overruled his motion for

judgment of acquittal because the evidence was insufficient to support a finding that he committed first-degree murder.

(2)  Petitioner was denied his rights to due process, a fair trial, and proof beyond a reasonable doubt when the trial court overruled his motion for judgment of acquittal because the evidence was insufficient to support a finding that he committed child abuse.

(3)  Petitioner was denied his rights to due process, a fair trial, and proof beyond a reasonable doubt when the trial court overruled his motion for judgment of acquittal because the evidence was insufficient to support a finding that he committed arson.

(4)  Petitioner was denied his rights to due process, a fair trial, a unanimous verdict, and freedom from double jeopardy when the trial court submitted Instruction No. 8, which did not specify what alleged act of child abuse was committed to find Petitioner guilty of Count III.

(5)  Petitioner was denied his rights to due process and a fair trial when the trial court admitted Dr. Long's testimony about the testing of J.L.'s blood and the level of carbon dioxide in J.L.'s blood.

(6)  Petitioner was denied his rights to due process, a fair trial, and present a defense when the trial court sustained the State's objection to Petitioner's offer of proof regarding Mira Huffman's statements to Naomi Hilliard.

(7)  Petitioner's rights to due process, a fair trial, a properly instructed jury, and effective assistance of counsel were violated when trial counsel failed to object to Instruction No. 8.

(8)  Petitioner's rights to due process, a fair trial, a conflict-free counsel, and effective assistance of counsel were violated when trial counsel represented Petitioner and J.L.'s half-brother while developing and attempting to present a defense of third-party guilt regarding Mira Huffman.

(9)  Petitioner's rights to due process, a fair trial, a fair and impartial jury, and effective assistance of counsel were violated when trial counsel failed to object to Petitioner being visibly shackled while walking from the jail to the courtroom during trial.

(10)  Petitioner's rights to due process, a fair trial, and effective assistance of counsel were violated when trial counsel failed to properly develop and present a defense of third-party guilt.

(11)  Petitioner's rights to due process, a fair trial, and effective assistance of counsel were violated when trial counsel failed to properly investigate and call an expert regarding the cause of the fire to rebut the State's expert.

(12)  Petitioner's rights to due process, a fair trial, and effective assistance of counsel were violated when trial counsel failed to properly investigate J.L.'s autopsy.

(13)     Petitioner's rights to due process, a fair trial, and effective assistance of counsel were violated when trial counsel failed to object to the State's late endorsement of Nate Pryer.

(14)     Petitioner's rights to due process, a fair trial, and effective assistance of counsel were violated when trial counsel failed to impeach Robert Hunter with the fact that Hunter could not have observed Petitioner in a red truck the day before the fire because the truck was not in operating condition.

(15)     Petitioner's rights to due process and effective assistance of counsel were violated when trial counsel improperly advised Petitioner that a conviction for first-degree murder was treated as a thirty-year sentence, so he had nothing to lose by going to trial.

(16)     Petitioner's rights to due process and effective assistance of counsel were violated when trial counsel failed to move for a mistrial after witnesses Natalie Arnold, Judith Hinkle, and Jaime Carter were observed discussing their testimonies and comparing their notes.

In January 2019, the Eastern District of Missouri transferred the matter to this Court because Petitioner's conviction arose in Buchanan County, which is in the Western District of Missouri.  Docs. #4-5.  After being granted three extensions of time, Respondent filed his response on April 24, 2019.  Docs. #10, 13, 16-17.  After being granted four extensions of time, Petitioner filed his traverse on September 27, 2019.  Docs. #19, 21, 23, 25-26.  On October 9, 2019, Petitioner filed an "Errata Sheet to Traverse," listing twenty-two corrections to his traverse.  Doc. #27.

## II.     STANDARD

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which amended 28 U.S.C. § 2254, a writ of habeas corpus shall not be issued on a claim litigated on the merits in state court unless the state court's decision either:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The "contrary to" and "unreasonable application" provisions in the first subsection have independent meaning.  The "contrary to" provision applies "if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a

question of law, or reached a decision contrary to Supreme Court precedent when confronting facts that were materially indistinguishable." *Jackson v. Norris*, 651 F.3d 923, 925 (8th Cir. 2011). The "unreasonable application" clause applies "if the state court correctly identified the governing legal principle, but unreasonably applied it to the facts of the particular case." *Id.*

Section 2254(d) "limits the applicability of the AEDPA's deferential standard to claims that have been 'adjudicated on the merits' in state court." *Worthington v. Roper*, 631 F.3d 487, 495 (8th Cir. 2011) (citation omitted). Federal courts are "directed to undertake only a limited and deferential review of underlying state court decisions." *Id.* (quoting *Collier v. Norris*, 485 F.3d 415, 421 (8th Cir. 2007)). "A federal court may not issue the writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* (internal quotations marks and citations omitted).

## III.    DISCUSSION
### A.    Alleged Court Errors
#### *(1)    Grounds One, Two, and Three: Motions for Judgment of Acquittal*

Petitioner argues the trial court erred in overruling his motions for judgment of acquittal on first-degree murder, first-degree child abuse, and second-degree arson.

#### (a)    First-Degree Murder

The trial court denied Petitioner's motion for judgment of acquittal on first-degree murder, and the Missouri Court of Appeals affirmed the trial court's decision. *King*, 453 S.W.3d at 370-72. In Ground One, Petitioner claims the appellate court unreasonably applied the law and made unreasonable determinations of fact when it affirmed the trial court's decision. Regarding this claim, the Missouri Court of Appeals stated the following:

> At trial, the doctor who performed the autopsy, Dr. Norton, told the jury that the probable cause of Son's death was manual strangulation. He testified that Son had bruises along the right side of the chin line and jawline, one closer to the chin, and further back closer to the ear. The

bruises appeared to be recent, having occurred within twenty-four hours. There were also recent bruises just above and below the right collarbone, which, Dr. Norton explained, is an area that children are not likely to injure while playing. There were also bruises on the neck consistent with having been strangled or choked, and there was bruising in the tissues around and behind the larynx. Significantly, Dr. Norton found no soot in the trachea or lungs. Dr. Norton concluded that the cause of death was "probably lack of oxygen to the brain secondary to not enough blood flow to the brain related to the pressing—the compression of the blood vessels in the neck." The bruising in the neck indicated blunt force injury to the neck, and the lack of any other cause of death indicated that the cause of death was manual strangulation. Dr. Norton testified that it takes a minimum of ten seconds of strangulation in order for someone to become unconscious and that it likely would take another one to two minutes for death to occur.

> The toxicology results showed that the carbon monoxide saturation in Son's blood was less than 10%, which is within the normal range, and was nowhere near the minimum 40% required to cause death. This, along with the evidence that there was no soot in Son's trachea or lungs, established that Son was dead before the fire started.

*King*, 453 S.W.3d at 370 (footnote omitted). While Petitioner "faulted" Dr. Norton for testifying J.L. "probably" died from manual strangulation, the Missouri Court of Appeals found "Dr. Norton's opinion did not have to be absolute for the evidence to be sufficient." *Id.* (citation omitted). The appellate court also observed evidence corroborated Dr. Norton causation finding, including the bruised tissue around J.L.'s larynx. *Id.* at 371.

Moreover, the Missouri Court of Appeals concluded circumstantial evidence supported the jury's finding that Petitioner knowingly caused J.L.'s death. *Id.* This evidence included but was not limited to (1) Petitioner's statement to J.L's mother that she would never see J.L. again; (2) J.L's suspicious injuries and bruises in the months preceding his death; (3) Petitioner telling the school he was taking J.L. out of school; (4) an individual seeing what he believed was J.L.'s "motionless body in the cab" of Petitioner's truck the day before J.L.'s death; (5) Petitioner stating he was taking J.L. to Petitioner's sister's house but his sister did not know where J.L. was that same day; (6) Petitioner failing to help rescue J.L. from the burning trailer; (7) Petitioner's behavior changing once law enforcement arrived at the fire; and (8) Petitioner saying he needed to get rid of gas cans after the fire. *Id.* The appellate court determined the foregoing evidence was "sufficient for a reasonable juror to find that [Petitioner] knowingly caused

Son's death by strangling him," and thus, the trial court did not err in denying his motion for acquittal on first-degree murder. *Id.* at 371-72.

This Court must determine whether the decision issued by the Missouri Court of Appeals was based on an unreasonable determination of fact or was contrary to or involved an unreasonable application of clearly established law. 28 U.S.C. § 2254(d). Petitioner argues the appellate court's decision was based on an unreasonable determination of fact because "[t]here was no corroborative causation evidence…that [his] son died of manual manipulation," and "Dr. Norton's testimony that strangulation 'probably' was the cause is insufficient" to find Petitioner guilty of first-degree murder. Doc. #3, at 14-15; Doc. #26, at 17. But, as identified *supra*, there was corroborating evidence of manual manipulation, and there was ample circumstantial evidence supporting the jury's finding of guilt of first-degree murder. *King*, 453 S.W.3d at 370-72.

Petitioner also claims the Missouri Court of Appeals unreasonably applied *In re Winship*, 397 U.S. 358 (1970), and *Jackson v. Virginia*, 443 U.S. 307 (1979), but he does not explain how the appellate court unreasonably applied the law espoused in those cases. Doc. #3, at 15; Doc. #26, at 16-18. Petitioner's failure to provide any facts – much less, particularized facts – supporting his claim for habeas corpus review violates Rule 2(c) of the Federal Rules Governing Section 2254 Proceedings and this Court's Local Rules. 28 U.S.C. § 2254 Rule 2(c)(2) (requiring a petitioner to, among other things, "state the facts supporting each ground"); L.R. 9.2(b)(12) (requiring a petitioner to state "the facts that support each" claim); *Adams v. Armontrout*, 897 F.2d 332, 334 (8th Cir. 1990) (holding a petitioner, to comply with Section 2254 Rule 2(c), must "state specific, particularized facts which entitle him or her to habeas corpus relief for each ground specified.").

Nevertheless, in *Winship*, the Supreme Court "explicitly h[e]ld that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364. In *Jackson*, the Supreme Court declared that when a court reviews "the sufficiency of the evidence to support a criminal conviction," "the relevant question is whether, after the viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt."  443 U.S. at 318-19.  In this matter, the Missouri Court of Appeals determined, after reviewing the evidence in the light most favorable to the State, the evidence was "sufficient for a reasonable the jury to find that [Petitioner] knowingly caused [J.L.'s] death by strangling him," and there was "sufficient evidence for the jury to find "deliberation."  453 S.W.3d at 369-70, 371-72

Based on the foregoing, the Court finds the decision of the Missouri Court of Appeals on the claim asserted in Ground One was not based on an unreasonable determination of facts in light of the evidence and was not an unreasonable application of clearly established federal law.  In addition, the Missouri Court of Appeals did not render unreasonable determinations of fact, and it correctly identified the governing legal principles and reasonably applied those principles to the facts before it. Accordingly, Ground One is denied.

(b)    First-Degree Child Abuse

In Ground Two, Petitioner claims the trial court erred in denying his motion for judgment of acquittal on first-degree child abuse, and the Missouri Court of Appeals erred in affirming that decision.  "[A] person commits the crime of abuse of a child if such person [k]nowingly inflicts cruel and inhuman punishment upon a child less than seventeen years old[.]"  *King*, 453 S.W.3d at 372 (quoting Mo. Rev. Stat. § 568.060.1(1)).  The State alleged Petitioner, between November 16, 2011, and January 10, 2012, struck J.L., who was under the age of seventeen, "with such repetition and force as to leave bruises and abrasions," and in doing so, he "inflicted cruel and inhuman punishment" on J.L.  *Id*.

At trial, the following evidence was presented with regard to the allegation of child abuse: (1) an individual witnessed Petitioner slap or hit J.L. in September or October 2011; (2) J.L.'s "teachers and counselors began noticing suspicious injuries on" J.L.; (3) on November 16, 2011, the school's principal noticed a bump on J.L.'s forehead; (4) in November 2011, Petitioner was informed that J.L. had behavioral problems at school, and when J.L. returned to school the following day, "he had purple splotches under his right eye and a purple or pink mark in the left corner of his eye," but J.L.'s explanations about the injuries were inconsistent; (5) by November 29, 2011,

J.L.'s injuries "had worsened," he "had scratches around his eyes and neck," and had a "large infected rip in the crease behind his ear," causing the school to call the child abuse hotline; (6) J.L. attended three out of fourteen school days in December 2011; (7) after he missed an entire week of school in December 2011, he returned to school with "a red spot in his left eye"; (8) J.L. did not return to school after the holiday break, and the school was informed "a tree had fallen" on him, resulting in his hospitalization; (9) upon returning to school on January 4, 2012, J.L. "had numerous large bruises on his face and a tear in the crease behind his *other* ear"; (10) on January 9, 2012, a school official noticed bruises on J.L.'s neck and stomach; and (11) when informed that J.L. lost bus privileges, Petitioner told a school official "he was going to take Son home and 'beat his butt.'" *Id.* at 372-73.

The Missouri Court of Appeals also noted Dr. Norton testified that J.L., at the time of his death, had "bruises along the right side of his jaw line, one closer to the chin, and one further back closer to the ear"; "bruises on and around [his] neck and collar-bone"; "bruising…around and behind the larynx"; "bruises on his right arm… consistent with having been grabbed very hard"; "bloody fluid and pus in [his] chest cavity" indicating "inflammation that had existed for some time and could have been caused by blunt impact to the chest"; and "bleeding around the right lung and bruising behind the belly cavity, both of which also could have been caused by blunt impact." *Id.* at 373.

The Missouri Court of Appeals found the evidence presented at trial was sufficient to establish Petitioner's guilt of child abuse beyond a reasonable doubt. *Id.*

> Here, a reasonable juror could infer from the evidence presented that [Petitioner] was injuring his son, was lying about how the injuries occurred, was instructing his son to lie about how the injuries occurred, and, when the school and Children's Services became concerned, pulled his son out of school. This evidence, combined with the fact that King was heard threatening to take Son home and "beat his butt" and had been seen inappropriately physically disciplining his son before, was sufficient evidence for a reasonable juror to find King guilty of child abuse.

> Viewing the evidence in the light most favorable to the verdict, there was sufficient evidence from which a reasonable juror could find that King inflicted cruel and inhuman punishment on Son and was guilty of felony child abuse.

*Id.* at 373-74.

As explained *supra*, this Court must determine whether the decision of the Missouri Court of Appeals is either contrary to or involved an unreasonable application of clearly established law or was based on an unreasonable determination of fact. 28 U.S.C. § 2254(d). Petitioner argues the Missouri Court of Appeals ignored there were valid explanations for J.L.'s injuries, "failed to acknowledge" J.L.'s school made a hotline call, and disregarded the subsequent investigation revealed no abuse. Doc. #3, at 17; Doc. #26, at 19. As he did with Ground One, Petitioner claims the appellate court unreasonably applied *Winship* and *Jackson*, but he does not explain how the appellate court unreasonably applied these cases. Doc. #3, at 17. Petitioner's failure to provide any facts supporting Ground Two violates Rule 2(c) of the Federal Rules Governing Section 2254 Proceedings and the Court's Local Rules. 28 U.S.C. § 2254 Rule 2(c)(2); L.R. 9.2(b)(12); *Adams*, 897 F.2d at 334.

Regardless of Petitioner's failure, the Court reviewed the record and the decision issued by the Missouri Court of Appeals. The Court finds the appellate court's decision was neither based upon an unreasonable determination of the facts in light of the evidence, nor was it an unreasonable application of clearly established federal law. The appellate court correctly identified the governing legal principles and reasonably applied those principles to the facts before it. Accordingly, Ground Two is denied.

(c)     Second-Degree Arson

In Ground Three, Petitioner argues the trial court erred when it denied his motion for judgment of acquittal because the evidence was insufficient to support a finding that he intentionally set fire to the mobile home, thereby committing arson. This claim was also decided by the Missouri Court of Appeals. *King*, 453 S.W.3d at 374-75.

> A person commits second-degree arson "when he knowingly damages a building or inhabitable structure by starting a fire or causing an explosion." § 569.050.1. To make a submissible case, the State must prove that a building was on fire, the fire was of an incendiary origin, and the defendant participated in commission of the crime. *State v. Bolds,* 913 S.W.2d 393, 397 (Mo. App. 1996). "Arson is a crime usually committed in stealth and seldom in the view of witnesses and, hence, guilt must ordinarily be proven by circumstantial evidence." *State v. Simpson,* 606 S.W.2d 514, 518 (Mo. App. 1980). "All elements of arson may be proven by circumstantial evidence." *Bolds,* 913 S.W.2d at 398. Circumstances need

not be absolutely conclusive of guilt and need not demonstrate
impossibility of innocence. *Id.*

*Id.* at 374.

Although Petitioner maintained the State failed to prove the fire "was of
incendiary origin," the Missouri Court of Appeals concluded there was sufficient
evidence presented at trial to establish the fire was incendiary. *Id.* Specifically, the
appellate court observed a fire investigator testified there was no accidental cause for
the fire, and although he did not find evidence of fire accelerants, the fire investigator
testified he "believed" an accelerant was used because the fire took fifteen to twenty
minutes to burn the mobile home. *Id.* The fire investigator also testified he did not
expect evidence of accelerants to remain "given the time line of the fire." *Id.* The
appellate court concluded the fire investigator's testimony "constituted sufficient
evidence that this fire was incendiary in nature." *Id.*

In addition to the fire investigator's testimony, the Missouri Court of Appeals
determined the circumstances surrounding the fire supported the jury's finding that
Petitioner set the fire. *Id.* Those circumstances included (1) Petitioner telling two
individuals he was going to run to a tire shop while J.L. was sleeping in the mobile
home; (2) after Petitioner left, smoke was observed and the mobile home was on fire;
(3) two individuals said Petitioner's "behavior that day" was "inconsistent with what they
would expect from a father under those circumstances," including Petitioner not
attempting to save J.L.; (4) Petitioner "pointlessly rammed his truck into the frame of the
mobile home"; (5) Petitioner did not scream, yell, cry, or become emotional until law
enforcement arrived; and (6) after the fire, Petitioner told someone he needed to get rid
of gas cans. *Id.* at 374-75. Based on the evidence presented, the appellate court found
there was sufficient evidence for a reasonable juror to find the fire was intentionally set
and Petitioner intentionally set it. *Id.* at 375.

Because the Missouri Court of Appeals adjudicated this claim, the Court is limited
to determining whether the appellate court's decision is either contrary to or involved an
unreasonable application of clearly established law or was "based on" an unreasonable
determination of fact. 28 U.S.C. § 2254(d). Petitioner argues the appellate court made
an unreasonable determination because the fire investigator found no accelerants were

used, and he was unable to determine the fire's cause.  Doc. #3, at 19; Doc. #26, at 19.
As he did with Grounds One and Two, Petitioner claims the appellate court
unreasonably applied *Winship* and *Jackson* but he does not explain how the appellate
court unreasonably applied these cases.  Doc. #3, at 19.  Petitioner's failure to provide
any facts supporting Ground Three violates Rule 2(c) of the Federal Rules Governing
Section 2254 Proceedings and the Court's Local Rules.  28 U.S.C. § 2254 Rule 2(c)(2);
L.R. 9.2(b)(12); *Adams*, 897 F.2d at 334.

Nonetheless, based on its review of the record and the decision by the Missouri
Court of Appeals, the Court finds the appellate court's decision on the claim raised in
Ground Three was neither based on an unreasonable determination of the facts in light
of the evidence, nor was it an unreasonable application of clearly established federal
law.  The appellate court correctly identified the governing legal principles and
reasonably applied the principles to the facts before it.  Thus, Ground Three is denied.

### (2)     Ground Four: Jury Instruction No. 8

Petitioner argues the trial court erred in submitting Instruction No. 8 because the
instruction did not specify which alleged act of child abuse was committed in order to
find him guilty of child abuse.  Instruction No. 8 stated the following:

> As to Count III, if you find and believe from the evidence beyond a
> reasonable doubt:
> First, that on or between November 16, 2011 and January 10,
>   2012, in the County of Harrison, State of Missouri, the defendant
>   struck [J.L.] with such repetition and force as to leave bruises and
>   abrasions on said child, and
> Second, that in so doing, defendant inflicted cruel and inhuman
>   punishment upon [J.L.], and
> Third, that [J.L.] was then less than seventeen years old, and
> Fourth, that defendant knew his conduct was inflicting cruel and
>   inhuman punishment upon a child less than seventeen years old,
> then you will find the defendant guilty under Count III of abuse of a child.
>   However, unless you find and believe from the evidence beyond a
> reasonable doubt each and all of these propositions, you must find the
> defendant not guilty of that offense.

Doc. #17-2, at 79; *King*, 453 S.W.3d at 376.  Petitioner admits his trial counsel did not
object to Instruction No. 8.  Doc. #3, at 20; *see also* Doc. #17-1, at 253.  On appeal,
Petitioner argued manifest injustice resulted from the trial court's failure to inform the

jury that it must unanimously find which act of alleged abuse constituted child abuse. Because trial counsel failed to object to the instruction, the Missouri Court of Appeals reviewed the issue for plain error. *King*, 453 S.W.3d at 375 (citations omitted).

This Court must first address whether Ground Four was procedurally defaulted. Petitioner argues the claim was not defaulted because the Eighth Circuit has held the failure to object to a jury instruction may not bar habeas relief "where a state court has reached the merits of the issue presented…." *Dietz v. Solem*, 640 F.2d 126, 131-32 (8th Cir 1981). Respondent maintains the claim was defaulted. Although not cited, it appears he relies on *Clark v. Bertsch*, 780 F.3d 873 (8th Cir. 2015). In *Clark*, the Eighth Circuit, observing an intra-circuit panel split, determined a state court's "discretionary plain-error review of [a petitioner's] unpreserved claim cannot excuse his procedural default…" *Id.* at 876-77. Petitioner argues the Eighth Circuit, when deciding *Clark*, incorrectly relied on a prior decision, and this Court should rely on *Dietz*. Doc. #26, at 20-21. But *Clark* has not been overturned or called into question by another Eighth Circuit panel. Thus, the Court must follow *Clark*.

The Missouri Court of Appeals exercised discretion to review the instructional error claim, which was not preserved for appeal, "only for plain error." *King*, 453 S.W.3d at 375. The appellate court's "discretionary plain error review" of Petitioner's unpreserved claim, however, does not excuse his procedural default of the claim. *Clark*, 780 F.3d at 877. Because "a federal habeas court cannot reach an otherwise unpreserved and procedurally defaulted claim" (even if the state court analyzed the claim for plain error), the Court must dismiss Ground Four.

Even if the Court considered the merits of Ground Four, its decision would remain unchanged. When claiming instructional error, a petitioner must establish not only that the instruction was erroneous but also "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citations omitted). The instruction "must be considered in the context of the instructions as a whole and the trial record," and the Court must consider "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Id.* (citation and internal quotation marks omitted).

The Missouri Court of Appeals found the evidence "revealed a pattern of abuse, and it was this pattern of abuse that the jury had to find – *i.e.*, *repetitive* strikes resulting in bruises and abrasions – not a single injury." *King*, 453 S.W.3d at 376. "By unanimously finding 'repetition,' it is apparent that the jurors agreed that [Petitioner] was guilty of the various acts committed during the specified dates." *Id.* Based on the foregoing and the record, the Court finds the appellate court's decision related to Instruction No. 8 was not based on an unreasonable application of clearly established law.[1] The appellate court correctly identified the governing legal principles and reasonably applied those legal principles to the facts before it.

In addition, this Court finds Petitioner has not established Instruction No. 8 was erroneous, and he has failed to demonstrate the instruction "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. In the context of the trial record, the Court finds it was unlikely the jury applied the challenged instruction in a way that violates the Constitution. Finally, Petitioner has not shown he was prejudiced by the giving of Instruction No. 8. Thus, even if the Court considered the merits of this claim, it would deny Ground Four.

### *(3)    Ground Five: Admission of Dr. Long's Testimony*

Petitioner claims the trial court erred in admitting Dr. Long's testimony about the testing of J.L.'s blood and his conclusions about the carbon dioxide levels in the blood. When appealing his convictions, Petitioner argued the evidence failed to show the blood

---

[1] The Missouri Court of Appeals provided a second basis for rejecting Ground Four. It determined the giving of Instruction No. 8 was not plain error because Petitioner's "defense was the same for all of the alleged incidents of abuse: he denied that he ever abused his son"; therefore, his "'unitary defense' makes it unlikely that individual jurors convicted him based on different acts." *King*, 453 S.W.3d at 377 (citation omitted). The appellate court could not conclude the instruction "misdirected the jury in a way that affected the verdict, thereby resulting in manifest injustice." *Id.* (citation omitted).

After the Missouri Court of Appeals issued its decision, the Missouri Supreme Court clarified a defendant may suffer prejudice from "insufficiently specific verdict directors" even if the defendant employs "a general or unitary defense" to the charged conduct. *Hoeber v. State*, 488 S.W.3d 648, 657 (Mo. banc 2016). *Hoeber* addresses whether counsel's failure to object to an insufficiently specific verdict director may constitute ineffective assistance of counsel, which is discussed *infra*, section III(B).

Dr. Long tested came from an iliac blood vessel, as opposed to the heart, and therefore, his testimony about the carbon monoxide level in J.L.'s blood should not have been admitted. On this claim, the Missouri Court of Appeals outlined the evidence as follows:

> The evidence at trial showed that Shawn Parcells and Nate Pryer assisted Dr. Norton at the autopsy. Parcells testified that Dr. Norton had previously instructed him that blood samples should be taken from a periphery vein or artery (such as from a leg or arm), and not from the heart. Parcells testified that he saw Dr. Norton draw the blood from the right iliac artery or vein and that this blood was sent to Dr. Long for testing. Because that sample was not very big, they also took a sample of clotted blood from the heart.

> Pryer testified that he packaged all the samples collected using a prepackaged kit. He also testified that he saw Dr. Norton draw blood from the iliac artery with a syringe and put it into a bottle. Pryer then sealed and labeled that bottle. Pryer identified that bottle of blood at trial. Blood clots from the heart were put into a separate bottle and sealed, he said. Pryer stated that the sealed bottles were placed in biohazard bags, then put into a box sealed with evidence tape and sent to Dr. Long in St. Louis via a FedEx clinical pack.

> Dr. Long testified that he received the items from FedEx on January 13, 2012. Before Dr. Long could testify about the toxicology results, defense counsel objected on the basis that a proper chain of custody had not been established. Defense counsel argued that Dr. Norton had not yet testified that he was the one who drew the blood and noted that, at his deposition, Dr. Norton never mentioned getting blood from an iliac vessel. The prosecutor responded that two witnesses had testified that Dr. Norton drew the blood from the iliac vein or artery and that he expected Dr. Norton to say the same. The court overruled the objection. Dr. Long thereafter testified that he tested the iliac blood sample and found that its carbon monoxide content was within the normal range, indicating that the victim had not died of smoke inhalation.

> Dr. Norton testified that his statement in the deposition that the blood was drawn from the heart was not correct. He stated that his usual practice is to get blood from the iliac vessels and that either he or his assistant would do the blood draw. Dr. Norton did not have an independent recollection as to who drew the blood in this case, but he confirmed that the blood came from the iliac vessels. On cross-examination, Dr. Norton agreed that both his diagrams and the final autopsy report indicated that the blood came from the heart. Defense counsel then renewed his objection to the toxicology results. The court overruled the objection, finding that the testimony of the other witnesses established that the blood was drawn from the iliac region.

*King*, 453 S.W.3d at 377-78 (footnote omitted).

Before the Missouri Court of Appeals, Petitioner argued Parcells's testimony was "inherently unreliable" because there was "overwhelming evidence" he engaged in "unethical conduct in other autopsies and that Pryer's testimony was unreliable because he works for Parcells." *Id.* at 378. The appellate court observed this issue was only addressed during Petitioner's cross-examination of Parcells during which he was asked if he had signed a doctor's name in another criminal case, of which Parcells claimed he had no knowledge. *Id.* It was up to the jury to determine Parcells's credibility and factor his credibility into their deliberations. *Id.*

The Missouri Court of Appeals observed a trial court has discretion to decide whether a sufficient foundation has been established for an exhibit to be admitted, and it also had discretion to determine "whether a sufficient chain of custody has been established for an exhibit." *Id.* (citations omitted). The appellate court found "the testimony presented was sufficient to lay a foundation as to where the blood came from and to establish a chain of custody for the blood tested by Dr. Long." *Id.* at 378-79. Even if the trial court erred in admitting the evidence, the appellate court determined Petitioner could not show the admitted evidence affected the outcome of the trial. *Id.* That is because the toxicology report was not the only evidence showing J.L. did not die in the fire. *Id.* "The State otherwise established that fact via the (perhaps even more persuasive) evidence that no soot was found in Son's trachea or lungs." *Id.*

Turning to Petitioner's arguments before this Court, the Eighth Circuit has held the admissibility of evidence "is a matter of state law and generally does not give rise to constitutional error subject to redress in a federal habeas corpus case." *Mendoza v. Leapley*, 5 F.3d 341, 342 (8th Cir. 1993) (citation omitted). "An evidentiary question is reviewable only when the alleged error infringes a specific constitutional right or is so grossly or conspicuously prejudicial that it fatally infected the trial and denied petitioner fundamental fairness." *Id.* (citations and internal quotation marks omitted). Thus, Petitioner "must establish an error which demonstrates a violation of due process by a burden much greater than that required on direct appeal and even greater than the showing of plain error." *Id.* (citation omitted).

Petitioner argues the trial court's error deprived him of substantive due process because the evidence was "highly prejudicial" and "lacked a sufficient foundation as to

its accuracy and origin." Doc. #3, at 26. Petitioner argues the decision of the Missouri Court of Appeals "was contrary to and [an] unreasonable application of Supreme Court precedent" and "was an unreasonable determination of facts on the record because the court overlooked the prejudicial impact such testimony had on petitioner's defense." *Id.* In his traverse, Petitioner supports his argument by citing criminal, civil, and other matters filed against Parcells related to his autopsy practices. Doc. #26, at 23-24. But he admits those matters were filed after Petitioner's criminal trial. *Id.* at 23.[2]

The Court finds Petitioner fails to demonstrate the trial court's alleged error infringed on a specific constitutional right or was grossly prejudicial that it infected the trial and denied him fundamental fairness. In addition, the Court concludes the decision by the Missouri Court of Appeals on Petitioner's Ground Five claim was neither based upon an unreasonable determination of the facts in light of the evidence, nor was it an unreasonable application of clearly established federal law. The Missouri Court of Appeals correctly identified the governing legal principles and reasonably applied those principles to the facts before it. Accordingly, Ground Five is denied.

### *(4)* *Ground Six: Sustaining Objection to Offer of Proof*

Petitioner alleges the Missouri Court of Appeals erred in affirming the trial court's denial of his offer of proof, resulting in the exclusion of statements by Mira Huffman, J.L.'s mother, on the day of the fire to show Huffman was the person who started the fire. Regarding this claim, the Missouri Court of Appeals stated the following:

> King presented the testimony of [Naomi] Hilliard in an offer of proof. Hilliard testified that on January 11, 2012, she and Huffman were sharing a house in Bethany. Hilliard stated that she received phone calls from Huffman that morning, which she did not answer, and that the first one was at 6:50 a.m. She said that Huffman later came into her bedroom and awoke her, screaming that she had been out to King's, that her son was on fire, and that King had killed him. Hilliard believed that this conversation occurred at about 7:00 a.m. Hilliard stated that they then went downstairs, and the house was full of people. On cross-examination,

---

[2] In his traverse, Petitioner also represents Pryer entered a guilty plea in January 2012 on misdemeanor charges for groping, and his counsel did not impeach Pryer with his prior guilty plea. Doc. #26, at 25. However, Petitioner's claim is related to the trial court's admittance of the evidence, not his trial counsel's failure to use certain evidence to impeach a witness. Thus, this argument is not relevant.

> Hilliard acknowledged that the phone calls she had received were on her cell phone, and she was confident that Huffman did not come into her room until **after** the phone calls. Phone records revealed that the phone calls from Huffman to Hilliard's cell phone did not occur until 7:35 a.m. Under questioning by the court, Hilliard stated that it was Huffman's family members who were in the house when they went downstairs and that they all knew about the fire and about what had happened to Son. The circuit court sustained the State's objection, finding that there was no direct evidence tying Huffman to the crimes and that King's proffered evidence was speculation and conjecture.

*King*, 453 S.W.3d at 379. The Missouri Court of Appeals found there was not abuse of discretion in excluding the proffered evidence because Petitioner "did not establish a direct connection between Huffman and the arson or the murder." *Id.* Rather, the evidence showed "Huffman arrived on the scene well after the fire was set," there was no evidence Huffman "was at the scene prior to the fire being started," and there was no evidence "Huffman had access to [J.L.] at the time of his death." *Id.*

Petitioner argues the appellate court's decision is an unreasonable application of *Estelle* and an unreasonable determination of the facts because "[d]irect evidence connected Ms. Huffman to the crime as she had both motive and opportunity to commit it." Doc. #3, at 28. Petitioner points out he and Huffman were in a "bitter custody battle" over their son, and Huffman was at the trailer on the morning of the fire. *Id.* at 28-29.

As stated *supra*, admissibility of evidence "is a matter of state law and generally does not give rise to constitutional error subject to redress in a federal habeas corpus case." *Mendoza*, 5 F.3d at 342 (citation omitted). An evidentiary issue may only be reviewed when the "alleged error infringes a specific constitutional right or is so grossly or conspicuously prejudicial that it fatally infected the trial and denied petitioner fundamental fairness." *Id.* In his traverse, Petitioner argues his due process rights were violated because "the jury did not hear evidence that Huffman had the motive and opportunity to be the perpetrator." Doc. #26, at 26.

The Court finds Petitioner fails to demonstrate the trial court's alleged error infringed on a specific constitutional right or was grossly prejudicial that it infected the trial and denied him fundamental fairness. In addition, the Court concludes the decision by the Missouri Court of Appeals on Petitioner's Ground Six claim was neither based upon an unreasonable determination of the facts considering the evidence, nor was it

an unreasonable application of clearly established federal law.  The Missouri Court of Appeals correctly identified the governing legal principles and reasonably applied those principles to the facts before it.  Accordingly, Ground Six is denied.


## B.    Alleged Ineffective Assistance of Counsel

Petitioner's remaining claims pertain to alleged ineffective assistance of counsel. Issues of ineffectiveness of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  "This standard requires [the applicant] to show that his 'trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense.'"  *Nave v. Delo*, 62 F.3d 1024, 1035 (8th Cir. 1995) (quoting *Lawrence v. Armontrout*, 961 F.2d 113, 115 (8th Cir. 1992)).  This analysis contains two components: a performance prong and a prejudice prong.

> Under the performance prong, the court must apply an objective standard and "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. *Id.* at 689.  Assuming the performance was deficient, the prejudice prong "requires proof 'that there is a reasonable probability that, but for a counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Lawrence*, 961 F.2d at 115 (quoting *Strickland*, 466 U.S. at 694).

*Id.*  Failure to satisfy both prongs is fatal to the claim.  *Pryor v. Norris*, 103 F.3d 710, 713 (8th Cir. 1997) (stating there is no need to "reach the performance prong if we determine that the defendant suffered no prejudice from the alleged ineffectiveness"); *see also DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000).  "An ineffective assistance of counsel claim is a mixed question of law and fact."  *McReynolds v. Kemna*, 208 F.3d 721, 723 (8th Cir. 2000).

Respondent concedes Grounds Seven, Eight, and Nine were properly presented to the state court courts and raised on post-conviction appeal but argues Petitioner's other claims were procedurally defaulted.  Doc. #17, 29-30, 34-35.  The Court will address the exhausted claims before turning to the remaining claims.

*(1)*    ***Grounds Seven, Eight, and Nine***

(a)    <u>Ground Seven: Failure to Object to Instruction No. 8</u>

Petitioner argues his trial counsel was ineffective because he failed to object to Instruction No. 8.  He contends the decision by the Missouri Court of Appeals on this issue was contrary to or involved unreasonable application of *Strickland* and was based on an unreasonable determination of facts.  Doc. #3, at 30.  Regarding this claim, the Missouri Court of Appeals stated the following:

> On direct appeal, King asserted that the circuit court plainly erred in submitting this verdict director because the State presented evidence of several instances of alleged abuse, but the instruction failed to specify which act constituted the crime charged or to instruct the jurors that they must unanimously agree on the same act.  *King*, 453 S.W.3d at 375.  King argued that the instruction allowed the possibility that the jury failed to unanimously find guilt as to the same act.  *Id.*  To support his argument, King relied on the Supreme Court's opinion in *State v. Celis-Garcia*, 344 S.W.3d 150, 152 (Mo. banc 2011), a case in which the State presented evidence that the defendant committed multiple criminal acts that were similar in nature against the same victim, but the verdict directors did not differentiate between those acts.  *King*, 453 S.W.3d at 376.  The Supreme Court found plain error in *Celis-Garcia* and reversed the defendant's convictions after finding that it was "impossible to determine whether the jury unanimously agreed on any of [the] separate incidents" such that "the verdict directors violated [the defendant's] constitutional right to a unanimous jury verdict."  *Id.* (quoting *Celis-Garcia*, 344 S.W.3d at 158).

> We determined that *Celis-Garcia* was not controlling in King's case, however, and rejected his plain error claim on two bases.  First, we found that King's case was "more akin to *State v. Miner*, 363 S.W.3d 145 (Mo. App. 2012), than to *Celis-Garcia*."  *Id.*  In *Miner*, the defendant was charged with aggravated stalking based on the allegation that, between two specific dates, he purposely harassed the victim "by repeatedly calling her and going to her home."  *Miner*, 363 S.W.3d at 147-48.  The court in Miner found that this instruction was proper because the defendant's threats "constituted a course of conduct over the charged period of time," so the jurors "needed only to agree unanimously over the period of time specified in the verdict director that his threats caused the victim to fear for her safety, rather than whether one specific threat did so."  *Id.* at 148.  In King's direct appeal, we explained why his case was similar to *Miner*:

> > As in *Miner*, the evidence in this case revealed a pattern of abuse, and it was this pattern of abuse that the jury had to find – i.e., repetitive strikes resulting in bruises and abrasions – not a single injury.  By unanimously finding "repetition," it is apparent that the jurors agreed that King

> was guilty of the various acts committed during the specified dates.

*King*, 453 S.W.3d at 376. Essentially, we concluded that, based on *Miner*, the court did not err in giving this instruction in King's case. Second, we also found that King failed to establish manifest injustice because he had mounted a unitary defense to all alleged acts of abuse, rather than an incident-specific defense that distinguished among the various acts, so it was unlikely that individual jurors convicted him based on different acts. *Id.* at 376-77.

> One year after *King* was decided, the Supreme Court, in *Hoeber*, 488 S.W.3d at 657, abrogated the holding in *King* and other cases "that the failure to mount an incident-specific defense precludes a finding that non-specific verdict directors resulted in manifest injustice." The Supreme Court's abrogation of *King*'s holding regarding the absence of manifest injustice had no effect on its holding that the circuit court did not err in giving the instruction. That holding still stands, and it precludes King from obtaining post-conviction relief based on the giving of that instruction.

Doc. #17-12, at 8-10.

Although he did not provide the particulars of this claim in his Amended Petition,[3] Petitioner, in his traverse, contends the Missouri Court of Appeals unreasonably determined facts when it found the trial court did not commit plain error in giving Instruction No. 8 because that finding was later abrogated by the Missouri Supreme Court. Doc. #26, at 27. He also argues the Missouri Court of Appeals incorrectly applied the plain error standard and should have applied *Strickland. Id.* Both arguments fail.

First, the Missouri Supreme Court did not abrogate the decision by the Missouri Court of Appeals that there was no plain error in the trial court giving Instruction No. 8. As stated in the decision by the Missouri Court of Appeals on Petitioner's post-conviction proceedings, the Missouri Supreme Court did not reverse or abrogate the appellate court's holding that the trial court did not err in giving Instruction No. 8. Doc. #17-12, at 10. Rather, the Missouri Supreme Court found the "failure to mount an

---

[3] As stated *supra*, Petitioner's failure to provide particularized facts supporting his claim for habeas corpus review violates Rule 2(c) of the Federal Rules Governing Section 2254 Proceedings and this Court's Local Rules. 28 U.S.C. § 2254 Rule 2(c)(2); L.R. 9.2(b)(12); *Adams*, 897 F.2d at 334.

incident-specific defense" did not preclude "a finding that non-specific verdict directors resulted in manifest injustice."  *Hoeber*, 488 S.W.3d at 657; Doc. #17-12, at 10.

Second, the Missouri Court of Appeals applied *Strickland*, not the plain error standard.  The Missouri Court of Appeals correctly noted that Petitioner "had the burden of establishing…his trial counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under the same or similar circumstances and that he was thereby prejudiced."  Doc. #17-12, at 7 (citations omitted).  Petitioner had to prove both the performance and prejudice prongs of the test to prevail on his ineffective assistance of counsel claim.  *Id.* (citation omitted).  Regarding the claim asserted in Ground Seven, the Missouri Court of Appeals acknowledged a "plain error point" reviewed on direct appeal on which the court finds no error "cannot be relitigated in post-conviction proceeding."  *Id.* at 10.  "This is because trial counsel will not be deemed ineffective based on actions that the appellate court determined on direct appeal were not errors, plain or otherwise."  *Id.* (citation and internal quotation marks omitted).  Petitioner fails to explain how the decision of the Missouri Court of Appeal does not comport with *Strickland*.  Petitioner's failure to do so violates Rule 2(c) of the Federal Rules Governing Section 2254 Proceedings and the Court's Local Rules.  28 U.S.C. § 2254 Rule 2(c)(2); L.R. 9.2(b)(12); *Adams*, 897 F.2d at 334.

Setting aside Petitioner's failure, Court finds the decision by the Missouri Court of Appeals on Petitioner's Ground Seven claim was neither based upon an unreasonable determination of the facts considering the evidence, nor was it an unreasonable application of clearly established federal law.  The Missouri Court of Appeals correctly identified the governing legal principles and reasonably applied those principles to the facts before it.  Accordingly, Ground Seven fails.

Even if the Court were to examine the basis of this ineffective assistance of counsel claim, Petitioner fails to demonstrate his trial counsel's failure to object to Instruction No. 8 was "outside the wide range of professionally competent assistance," and he fails to prove that "but for" his trial counsel's failure to object to Instruction No. 8, "the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 690, 694.  Thus, regarding the performance prong, Petitioner does not cite any authority establishing that Instruction No. 8, when given, was a violation of state law and/or his

counsel's failure to object to Instruction No. 8 was outside the range of professionally competent assistance.  For this additional reason, Ground Seven fails.

Moreover, even if Petitioner could establish the performance prong, he fails to satisfy the prejudice prong of *Strickland*.  As the Supreme Court has held, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.  Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693 (citations omitted).  Consequently, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  To determine whether Petitioner was prejudiced, this Court "must consider the totality of the evidence before the judge or jury." *Id.* at 695.  If a verdict is "only weakly supported by the record," the verdict is "more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.  This Court "must ask if [Petitioner] has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.*

Petitioner does not demonstrate there was a "reasonable probability" the jury "would have had a reasonable doubt respecting [Petitioner's] guilt" absent his trial counsel's alleged error. *Shelton v. Mapes*, 821 F.3d 941, 947-78 (8th Cir. 2016) (citations omitted).  Instead, Petitioner offers only speculation that he was prejudiced by his trial counsel's failure to object to Instruction No. 8.  But speculation does not satisfy the prejudice prong under *Strickland*. *See Sanders v. Trickey*, 875 F.2d 205, 210 (8th Cir. 1989).  Regardless of Petitioner's failure, the Court has considered the totality of the evidence before the jury, and finds the verdict rendered on the child abuse charge was strongly supported by the record.  For this additional reason, Ground Seven fails.

(b)  Ground Eight: Conflict of Interest

Petitioner alleges his trial counsel was ineffective because he represented Petitioner and Austin Davis, who is J.L.'s half-brother and Mira Huffman's older son,

while developing a defense of third-party guilt. Trial counsel, a Chillicothe Public Defender, represented Davis on two cases unrelated to the charges against Petitioner. Doc. #17-12, at 12. Trial counsel's "initial representation of Davis ended before Smith began representing King, although there was a three-day overlap when the Chillicothe Public Defender's Office was involved in both cases." *Id.* Trial counsel's "second representation of Davis began after the trial in King's case ended." *Id.*

Despite his failure to plead this claim in post-conviction state court proceedings, the motion court still addressed the claim. *Id.* at 12-13. During an evidentiary hearing in state court, Petitioner testified he told his trial counsel "he thought Davis might be a favorable witness in his case." *Id.* at 12. But Petitioner "did not include this allegation in either his amended motion or his pro se motion." *Id.* Trial counsel testified he discussed his initial representation of Davis with Petitioner, and he did not object to the representation or express he was upset with the representation. *Id.* The motion court found Petitioner's testimony was not credible, but trial counsel's testimony was credible. *Id.* Also, the motion court determined trial counsel made no decisions in Petitioner's case that were related to or because of Davis. *Id.* at 13.

When he appealed the motion court's decision to the Missouri Court of Appeals, Petitioner asserted an "actual conflict" existed because his trial counsel had a duty to advocate that Huffman, who was J.L.'s and Davis's mother, was J.L.'s killer. *Id.* at 13. The Missouri Court of Appeals noted Petitioner failed to include this allegation in his amended or *pro se* post-conviction motion. *Id.* However, the appellate court, *ex gratia*, addressed the allegation, finding "trial counsel did, in fact, attempt to present evidence that Huffman was the person who started the fire and killed J.L." *Id.* That is, Petitioner's trial counsel "made an offer of proof consisting of testimony from Huffman and her housemate that purported to link Huffman to the fire." *Id.* However, the trial court rejected the offer of proof, finding "no direct evidence tying Huffman to the crimes and [Petitioner's] proffered evidence was speculation and conjecture." *Id.* When Petitioner appealed his convictions, the Missouri Court of Appeals found "no error" in the trial court's ruling. *Id.* at 13-14 (citing *King*, 453 S.W.3d at 379). In his post-conviction proceeding before the state appellate court, Petitioner did not specify what evidence "his trial counsel should have presented that would have made his proposed

defense that Huffman started the fire and killed J.L. admissible"; thus, the Missouri Court of Appeals found he failed to establish an actual conflict of interest.  *Id.* at 14.

Before this Court, Petitioner does not specify how or why the decision issued by the Missouri Court of Appeals regarding Ground Eight unreasonably applied the law or was based on unreasonably determined facts.  *See* Doc. #3, at 31-32; Doc. #26, at 28-29.  Petitioner's failure to do so violates Rule 2(c) of the Federal Rules Governing Section 2254 Proceedings and the Court's Local Rules.  28 U.S.C. § 2254 Rule 2(c)(2); L.R. 9.2(b)(12); *Adams*, 897 F.2d at 334.

To the extent Petitioner relies on the same theories advanced in his post-conviction state court proceedings, the Court finds the decision by the Missouri Court of Appeals on Petitioner's Ground Eight claim was neither based upon an unreasonable determination of the facts considering the evidence, nor was it an unreasonable application of clearly established federal law.  The Missouri Court of Appeals correctly identified the governing legal principles and reasonably applied those principles to the facts before it.  Thus, Ground Eight is denied.

(c)      Ground Nine: Visibly Shackled While Walking from Jail to Courtroom

Petitioner alleges his trial counsel was ineffective by failing to object to Petitioner being visibly shackled while walking between the jail and the courtroom during trial. Although he failed to state the basis of this claim in his Amended Petition in violation of the applicable rules, Petitioner, in his traverse, argues the Missouri Court of Appeals unreasonably applied *Deck v. Missouri*, 544 U.S. 622 (2005).  Doc. #26, at 30-31. Regarding the claim asserted in Ground Nine, the Missouri Court of Appeals stated the following:

> In *Deck v. Missouri*, 544 U.S. 622, 633 (2005), the United States Supreme Court held that it is unconstitutional to require a defendant to appear in a courtroom in visible restraints absent a finding of special circumstances.  Since *Deck*, the Missouri Supreme Court has held that *Deck* applies only to visible restraints.  *Zink*, 278 S.W.3d at 186-87. Additionally, this court has held that Deck does not apply to the use of visible restraints while a defendant is being transported to and from court. *State v. Swopes*, 343 S.W.3d 705, 709-10 (Mo. App. 2011).  Indeed, as stated in *Swopes*, "it is a normal and regular, as well as a highly desirable and necessary, practice to handcuff prisoners when they are being taken

from one place to another, and the jury is aware of this." *Id.* at 709 (quoting *State v. Snowden*, 285 S.W.3d 810, 814-15 (Mo. App. 2009)).

The record indicates that King wore leg braces at all times during the trial, but the leg braces were not visible to the jury. King also wore handcuffs and ankle shackles when he was being transported to and from court, but these restraints were removed before the jury came in the courtroom. King admitted that the jury never saw him in restraints in the courtroom, and both of his trial counsel testified that, to their knowledge, King never appeared in front of the jury in visible restraints. Instead, King argues that members of the venire panel, including some who served on the jury, saw him in handcuffs and ankle shackles as he was being transported to and from court.

The motion court expressly found, however, that King's testimony that venire persons and jurors saw him in visible restraints while he was being transported was not credible. The court noted that, after the trial commenced, the court instructed the marshal to hold the jury at recesses and adjournments until after King left the courtroom and entered the jail. Additionally, the court accepted King's trial counsel's testimony that King never told them that that any venire persons or jurors had possibly seen him in restraints while he was being transported to and from court. Moreover, per *Swopes* and *Snowden*, the mere fact that jurors might have briefly inadvertently seen him while he was being transported did not deprive him of a fair trial and did not result in prejudice. *Swopes*, 343 S.W.3d at 709-10; *Snowden*, 285 S.W.3d at 815. The motion court did not clearly err in denying this claim.

Doc. #17-12, at 14-16.

Petitioner concedes "the Supreme Court has not directly held that a defendant's constitutional rights are violated when jurors see him shackled during transport to or from the courtroom." Doc. #26, at 30. But, to salvage this claim, Petitioner contends it is "clearly established" law that he has a constitutional right not to be visibly shackled when being transported to and from the courtroom. *Id.* In support, Petitioner cites two cases – one from the First Circuit and one from the Third Circuit – and contends "[t]he holding in *Deck* is sufficient to establish" his right not to be shacked during transport to and from the courtroom. *Id.* Petitioner's argument and case citations, however, hardly show "clearly established" law provides this purported right. Further, Petitioner does not demonstrate his constitutional rights were violated in that he fails to present evidence demonstrating any juror observed him while shackled.

The Court finds the decision by the Missouri Court of Appeals on Petitioner's Ground Nine claim was neither based upon an unreasonable determination of the facts considering the evidence, nor was it an unreasonable application of clearly established federal law.  The Missouri Court of Appeals correctly identified the governing legal principles, including but not limited to *Deck* and *Strickland*, and reasonably applied those legal principles to the facts before it.  Accordingly, Ground Nine is denied.

### *(2)    Grounds Ten Through Sixteen*

#### (a)    Exhaustion

Respondent contends Grounds Ten through Sixteen must be dismissed because Petitioner failed to exhaust his state remedies.  Petitioner concedes these grounds were not presented to the state courts, but he argues he can overcome default.

Before presenting a federal habeas claim, a petitioner must properly exhaust his state remedies.  28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 843 (1999).

> Under the doctrine of procedural default, a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule.  A procedural default occurs when a prisoner violates a state procedural rule and this violation serves as an independent and adequate state-law basis to uphold the state courts' dismissal of a claim, thereby precluding consideration of federal claims on direct appeal.  In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law.

*Franklin v. Hawley*, 879 F.3d 307, 311 (8th Cir.), *cert. denied*, 139 S. Ct. 116 (2018) (internal citations and quotation marks omitted).  "A showing of cause and prejudice may serve to excuse a procedural default and open the door to federal review of an applicant's otherwise defaulted claim."  *Armstrong v. Kemna*, 590 F.3d 592, 606 (8th Cir. 2010).  Ineffective assistance of post-conviction motion counsel may qualify as cause.  *Martinez v. Ryan*, 566 U.S. 1, 13-14 (2012).  To demonstrate cause, Petitioner must show post-conviction counsel was ineffective in failing to raise a substantial claim of, in this matter, ineffective assistance of trial counsel.  *Id.* at 14.  A "substantial" claim is a claim that "has some merit" – that is, Petitioner must show "his counsel was

deficient and his counsel's deficient performance prejudiced him." *Id.* (citation omitted); *Slocum v. Kelley*, 854 F.3d 524, 532 (8th Cir. 2017) (citation omitted). Procedural bar prejudice "is higher than that required to establish ineffective assistance of counsel under *Strickland*." *Armstrong*, 590 F.3d at 606 (citation omitted).

Typically, the Court addresses procedural issues before proceeding to a claim's merits. However, judicial economy dictates reaching the merits of a habeas claim when the merits are easily resolvable against a petitioner. *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (proceeding to the merits where the procedural default issue is difficult to resolve); *Chambers v. Bowersox*, 157 F.3d 560, 564 n.4 (8th Cir. 1998) ("[t]he simplest way to decide a case is often the best."). Thus, the Court addresses the merits of Petitioner's claims, rather than the procedural issues, when the merits are more easily resolvable.

(b)    <u>Ground Ten: Third-Party Guilt</u>

Petitioner argues his trial counsel was ineffective by failing to properly develop and present a defense of third-party guilt. Because of his counsel's allegedly deficient performance, Petitioner contends "the jury never heard evidence that Mira Huffman had the motive and means to start the fire. But for this failure, there is a reasonable probability that the outcome of the trial would have been different." Doc. #3, at 35. But Petitioner does not show his trial counsel's performance was "so deficient as to fall below an objective standard of reasonable competence." *Nave*, 62 F.3d at 1035. As discussed *supra*, Petitioner's trial counsel presented evidence potentially linking Huffman to the crimes in an effort to assert a third-party guilt defense. The trial court, however, found there was no direct evidence connecting Huffman to the crimes.

Before this Court, Petitioner does not identify any evidence that his trial counsel failed to present in his offer of proof. Accordingly, the alleged failure by counsel to further develop and present a defense of third-party guilt does not amount to deficient performance. Even if trial counsel's performance had been deficient, Petitioner does not establish prejudice, other than providing an unsupported statement that there was a "reasonable probability" that the trial's outcome would have been different. His

speculation is insufficient to demonstrate prejudice.  *See Sanders*, 875 F.2d at 210.  For
these reasons, Ground Ten is denied.[4]

(c)     <u>Ground Eleven: Fire Investigator</u>

Petitioner argues his trial counsel was ineffective by failing to properly investigate
and call an expert about the cause of the fire and to rebut the State's expert.  He avers,
"[a] fire expert could have presented his findings as to the cause of the fire that would
have contradicted the State.  Had counsel presented the testimony of an expert, there is
a reasonable probability that the outcome of [the] trial would have been different."  Doc.
#3, at 39.  Petitioner raised this claim in his post-conviction motion in state court.

Overlooking Petitioner's failure to sufficiently plead this claim, the motion court
found Petitioner "failed to introduce sufficient evidence to support this claim" and "did
not call any expert witness at the post-conviction hearing."  Doc. #17-7, at 332.
"Without testimony from any proposed expert, the evidence only shows that [Petitioner]
would have liked to have had an expert take a second look at the conclusions of [the
State's experts] in the hope that the expert would have reached a different conclusion
than the State's experts."  *Id.*  The motion court found there was "no evidence that a
competent expert would have reached a substantially different conclusion or that any
testimony from such an expert would have created a reasonable probability of a
different result."  *Id.*  Although Petitioner raised this claim with the motion court, he
abandoned the claim when he appealed.  For this reason alone, this claim was
defaulted.

Nevertheless, when considering the merits of Ground Eleven, the Court finds
Petitioner does not demonstrate his trial counsel's performance was "so deficient as to
fall below an objective standard of reasonable competence."  *Nave*, 62 F.3d at 1035.
Similar to his argument to the motion court, Petitioner presents nothing more than
speculation as to why his trial counsel was deficient.  In addition, he fails to show there
is a "reasonable probability" that, but for his trial counsel's failure to call an expert, the
result of the trial would have been different.  *Strickland*, 466 U.S. at 694.  Petitioner also

---

[4] Because he fails to demonstrate prejudice under *Strickland*, Strickland also fails to
establish prejudice to overcome procedural default.  *Armstrong*, 590 F.3d at 606.

ignores the observation by the Missouri Court of Appeals – that is, even if the fire investigator's testimony was excluded, the circumstances surrounding the fire supported the jury's finding that Petitioner set the fire. *King*, 453 S.W.3d at 374-75. Accordingly, Ground Eleven is denied.[5]

(d)     Ground Twelve: Autopsy

Petitioner maintains his trial counsel was ineffective because he failed to properly investigate the autopsy of J.L. He argues trial counsel should have investigated (1) Dr. Norton's phone records and credit card receipts to determine whether he conducted the autopsy in Kansas or just signed off on someone else's work; and (2) whether the same ink was used and whether the same person wrote the autopsy notes. Doc. #3, at 40-41. Petitioner contends these failures equate to deficient performance. *Id.* at 41. He also alleges he was prejudiced because "evidence could have been discovered that would have been, at the least, impeaching as to the testimon[ies] of [the State's witnesses]" and "evidence could have been developed that would have led to [sic] the court to suppress the autopsy results…." Doc. #26, at 35 n.3. This evidence, according to Petitioner, could have included "Parcells['s] penchant for masquerading as a pathologist and doctor." *Id.* at 36.

Petitioner raised of version of this claim in the motion court but abandoned the claim when he appealed. He now appears to raise new facts and/or theories supporting this claim in this proceeding. Overlooking the fact that this claim has been defaulted, the Court finds Petitioner has not shown his trial counsel's performance was "so deficient as to fall below an objective standard of reasonable competence." *Nave*, 62 F.3d at 1035. In fact, Petitioner fails to recognize the concerns regarding Parcells's practices did not arise until after the trial in this matter[6]; thus, his trial counsel would not have discovered those matters. Also, Petitioner only speculates his trial counsel was deficient and the outcome of the trial would have been different had his trial counsel not

---

[5] *See supra*, n.4.
[6] Petitioner seems to concede this point, noting "more reasons to doubt Parcell's [sic] and Pryer's trial testimony has come to light" "[s]ince petitioner's trial." Doc. #26, at 23.

been deficient.  But speculation does not establish prejudice under *Strickland.  Sanders*, 875 F.2d at 210.  Accordingly, Ground Twelve is denied.[7]

(e)    <u>Ground Thirteen: Late Endorsement</u>

Petitioner argues trial counsel was ineffective for failing to object to the State's late endorsement of witness Nate Pryer on the second day of trial.  He contends a reasonably competent attorney would have objected to the late endorsement of Pryer "because his testimony that he observed Norton draw blood from the iliac was crucial in establishing Dr. Norton's credibility and Dr. Long's findings as to the amount of carbon monoxide" in J.L.'s blood.  Doc. #3, at 43.  But for his trial counsel's allegedly deficient performance, Petitioner maintains "there is a reasonable probability that the outcome" of the trial "would have been different" and he "was prejudiced as this claim had an arguable likelihood of success."  *Id.* at 44; Doc. #26, at 37.  Respondent points out Petitioner does not argue the content of Pryer's testimony was unknown to trial counsel.  This is because, in February 2013, trial counsel filed a notice to take Pryer's deposition.  Do. #17, at 52.  Respondent also argues any objection to the late endorsement likely would have been denied because of trial counsel's prior knowledge of the witness.

Nonetheless, upon review of the record, the Court finds Petitioner has not shown trial counsel's performance was "so deficient as to fall below an objective standard of reasonable competence."  *Nave*, 62 F.3d at 1035.  Petitioner only speculates trial counsel was deficient.  Further, his speculation that the outcome of the trial would have been different had his trial counsel objected to the late endorsement of Pryer does not satisfy the prejudice prong of *Strickland.  Sanders*, 875 F.2d at 210.  Therefore, Ground Thirteen is denied.[8]

(f)    <u>Ground Fourteen: Impeachment of Robert Hunter</u>

Petitioner argues his trial counsel was ineffective when he failed to impeach Robert Hunter with the fact that Hunter could not have observed Petitioner in a red truck the day before the fire because the red truck was not in operating condition on that date.

---

[7] *See supra*, n.4.

[8] *See supra*, n.4.

Doc. #3, at 45. Petitioner claims he informed his trial counsel of this fact and provided the names of two witnesses who could testify about the truck being inoperable. *Id*. at 45-46. He believes this evidence could have impeached Hunter and lessened his credibility in the jury's eyes. He contends if the impeachment evidence was offered and admitted, there could have been "a reasonable probability that the outcome" of the trial "would have been different." *Id*. at 46. Petitioner asserted this claim before the motion court but abandoned it on appeal. Thus, the claim has been defaulted. However, even if the claim was not defaulted, it still fails.

The motion court noted Hunter's trial testimony was ambiguous as to whether he saw J.L.'s body in Petitioner's truck on the day before the fire. Doc. #17-7, at 326. The motion court also observed Petitioner's trial counsel, through cross-examination of other witnesses, established Petitioner "was not driving the truck apparently described by Hunter and that the truck that Hunter described was actually at the Hardens being repaired during that time period." *Id*. at 327. According to the motion court, based on the evidence presented, "the jury could have concluded one of three things": (1) the "other witnesses were wrong about the vehicles [Petitioner] was driving between January 9 and January 11"; (2) "Hunter was correct about [Petitioner] stopping by Hunter's residence on the morning of January 10 with what appeared to be a child's body but was wrong about the vehicle [Petitioner] was driving (confusing this visit with another visit)"; or (3) "Hunter was not telling the truth about [Petitioner] stopping by Hunter's residence on the morning of January 10." *Id*.

The motion court also remarked Petitioner's trial counsel had an investigator talk with the Hardens. *Id*. at 310. The Hardens told the investigator they saw Petitioner on January 10, 2012, but did not see J.L. with him. *Id*. Consequently, trial counsel "did not want to call the Hardens" because (1) he believed "Hunter's testimony would be ambiguous on whether [J.L.] was dead at the time of the visit," and (2) the Hardens never saw J.L. with Petitioner, which potentially reinforced "the concept that [J.L.] was already dead by the morning of January 10." *Id*. at 310-11. The motion court concluded Petitioner "failed to demonstrate" the testimony of Darrell Harden or Richard Harden "would have been anything other than cumulative to the other testimony suggesting

that, on the morning of January 10, [Petitioner] was not driving the truck described by Hunter.  As such, [Petitioner] has failed to demonstrate prejudice."  *Id.* at 310-11, 327.

Upon review of the record, the Court finds Petitioner has not shown his trial counsel's performance was "so deficient as to fall below an objective standard of reasonable competence."  *Nave*, 62 F.3d at 1035.  Petitioner's bald assertions that his counsel was deficient are insufficient.  Further, his speculation that the trial outcome would have been different does not satisfy *Strickland*.  *Sanders*, 875 F.2d at 210. Because Petitioner does not demonstrate his counsel's performance was deficient and that he was prejudiced, Ground Fourteen is denied.[9]

(g)    Ground Fifteen: Advice Regarding Plea Offer

Petitioner alleges his trial counsel was ineffective by "misadvising" him as to a plea offer and the sentence he would receive if a jury found him guilty.  According to Petitioner, his trial counsel told him "it did not make sense…to take the [State's] offer [of a life sentence with parole] because if he was convicted after a jury trial, he would still only have to do a thirty-year sentence."  Doc. #3, at 47.  Petitioner argues it was not until he arrived at the Department of Corrections that he learned his life sentence was without parole.  *Id.*  He states he would have accepted the State's offer and pleaded guilty if he "had been properly advised that a life sentence without parole meant just that and not that it would be treated as [a] thirty-year sentence."  Doc. #26, at 38; Doc. #3, at 47.  He argues "[a] reasonably competent counsel…would have advised [him] that a life sentence for a capital murder conviction was without parole."  Doc. #3, at 47.

Some additional background facts are necessary for the Court's discussion of this claim.  On February 22, 2012, the Information filed by the State stated, "[t]he range of punishment for a class A felony is imprisonment…for a term of years not less than ten (10) years and not to exceed thirty (30) years, or life imprisonment."  Doc. #17-2, at 14.  On April 2, 2013, the trial court conducted a hearing during which Petitioner was present.  Doc. #17-1, at 11.  The trial court sought clarification of the Information:

> **THE COURT:** There was one matter that was on the information that I had some question about, and I wanted to make sure everybody's

---

[9] *See supra*, n.4.

on the same page here.  On the second page at the bottom of it, says, "Count I, the range of punishment for a class A felony is imprisonment in the custody of the Missouri Department of Corrections for a term of years not less than 10 years and not to exceed 30 years or life imprisonment."

It's my understanding the defendant's charged with murder in the first degree, which does not have the range of punishment.

**MR. HICKS:**[10] That is correct, Your Honor.  That would be an -- incorrect on the information regarding the range of punishment for Count I.

**THE COURT:** Everybody realizes that?

**MR. MILLER:**[11] I do, Your Honor.

**THE COURT:** We had the discussion about the possible punishments for first-degree murder, and early on the State waived their request with the death penalty.  So the only possible sentence is life imprisonment without parole if the defendant's found guilty of that particular degree of homicide, correct?

**MR. MILLER:** Understood, Your Honor.

Doc. #17-1, at 13.  Thus, weeks before trial, Petitioner knew the only possible sentence, if found guilty by a jury on Count I, was life imprisonment without parole.

The trial began on April 29, 2013.  *Id.* at 44.  On the morning of the first day, trial counsel informed the trial court that the State extended a plea offer to Petitioner that morning.  Doc. #17-1, at 32.  When asked by the trial court, Petitioner acknowledged receiving information from trial counsel about the plea offer, and he stated he was not accepting the plea offer.  *Id.* at 32-33.  The trial court asked if there were "any questions about what that offer involved."  *Id.* at 33.  Trial counsel answered in the negative.  *Id.* The offer, however, was not made part of the record.  *Id.*

The sentencing hearing was held on July 12, 2013.  *Id.* at 266-76.  At the outset, the trial court noted Petitioner filed, *pro se*, a letter and attachment on July 8, 2013.  *Id.* at 266.  Although the record presented to this Court did not include the letter and attachment, the filings are available on the Missouri courts' electronic docketing system. In these filings, Petitioner raised several issues but did not mention anything about the plea offer or his trial counsel's advice regarding same.  Regardless, the trial court

---

[10] Hicks represented the State.  Doc. #17-1, at 11.
[11] Miller represented Petitioner.  Doc. #17-1, at 11.

overruled Petitioner's filings because they were untimely, and Petitioner was represented by counsel at the time of the filings. *Id.*

After denying Petitioner's motion for a new trial, the trial court heard arguments from the parties. *Id.* at 268. The State represented, "the sentence that remains available to the Court on Count I [first-degree murder] is a sentence of life without the possibility of parole." *Id.* at 272. Petitioner's trial counsel admitted that "the Court has its hands tied as far as sentencing is concerned for the most part," and said he "certainly underst[oo]d that [Petitioner]'s going to be sentenced to life without the possibility of parole…." *Id.* The trial court sentenced Petitioner on Count I to "a term of life…without the possibility of probation or parole." *Id.* at 273. Thus, Petitioner knew at the sentencing hearing (not when he arrived at the Missouri Department of Corrections as he represents to this Court) that he was sentenced to life imprisonment without the possibility of parole.

After the sentence was announced, the trial court directed counsel and Petitioner to approach the bench. *Id.* Petitioner was placed under oath, and the trial court asked him if his trial counsel did as he asked in preparing the matter. *Id.* Petitioner answered in the negative, stating he asked trial counsel to do the following but trial counsel failed to do so: (1) file a motion to suppress; (2) bring to the trial court's attention that a witness, after testifying, was talking with other witnesses; (3) notify the trial court that Dr. Norton, Parcells, and Pryer "all had a discussion about what they was [sic] going to testify to before trial"; (4) inform the trial court that J.L.'s teachers were discussing their testimonies and comparing notes in the hallway; (5) subpoena Darrell Harden and Richard Harden to testify; (6) object to the State showing or viewing the attendance record from J.L.'s school; (7) object to "Ms. Carter's tearful testimony"; and (8) address the differences between the two autopsy body diagrams and the two autopsy reports. *Id.* at 273-74. The trial court informed Petitioner that "these are issues which are not likely to have changed the outcome of the trial. They're not likely to be prejudicial, to cause you prejudice even if counsel was ineffective…. But these are matters that you can bring up in a subsequent motion." *Id.* The trial court advised Petitioner of his right to file a motion for post-conviction relief. *Id.* Although Petitioner was sentenced to life imprisonment without the possibility of parole moments before the trial court asked him

about ineffective assistance of trial counsel, at no time during this interaction did Petitioner raise an issue with trial counsel's advice on the plea offer. *Id.*

When Petitioner filed his *pro se* motion for post-conviction relief, the form he utilized explicitly told him he was required to include "every claim known to [the movant] for vacating, setting aside or correcting the conviction and sentence or it will be waived or abandoned. Be sure to include every claim." Doc. #17-7, at 13. Although Petitioner knew when he filed his *pro se* motion that his trial counsel provided "misadvice" to him on the plea offer, he did not include such a claim. *Id.* at 13-31.

Once counsel was appointed, an amended motion for post-conviction relief was filed. *Id.* at 32-73. The amended motion, however, did not include a claim about trial counsel's advice as to the plea offer and the sentence he would face if found guilty of Count I. *Id.* When deposed in relation to the post-conviction proceeding, Petitioner did not mention his trial counsel's advice on the plea offer or the sentence he would face on Count I if he proceeded to trial. Doc. #17-7, at 88-183.

No claim related to trial counsel's advice on the State's plea offer was alleged until the Amended Petition filed in this Court. Petitioner maintains this claim was not raised in state court due to ineffective assistance of his post-conviction counsel. Doc. #3, at 49. Respondent contends this claim has been defaulted, and Petitioner cannot overcome the default because he has not demonstrated the claim has merit. He points to (1) Petitioner's misrepresentation that he did not know he had been sentenced to life without the possibility of parole until he reported to the Missouri Department of Corrections; (2) Petitioner's failure to identify trial counsel's advice about the plea offer when the trial court asked him to identify instances of counsel's ineffective assistance; (3) Petitioner's failure to include this claim in his *pro se* motion for post-conviction relief; and (4) Petitioner's failure to plead any facts in this Court reflecting he told his post-conviction motion counsel about this claim. Doc. #17, at 55-56.

The record belies Petitioner's representation that he lacked knowledge as to the potential sentence he faced or the actual sentence he received on Count I. On April 2, 2013, Petitioner was present for a hearing in which the sole possible sentence for Count I was not only discussed but it was expressly clarified. Thus, weeks before going to trial, Petitioner knew he was facing a sentence of life imprisonment without the

possibility of parole if he was found guilty by a jury. Doc. #17-1, at 13. When sentenced on July 12, 2013, the State's counsel and Petitioner's counsel both represented the only available sentence on Count I was life imprisonment without the possibility of parole. *Id.* at 272-73. Then, the trial court sentenced Petitioner to life imprisonment without the possibility of parole. *Id.* Accordingly, Petitioner, contrary to his argument to this Court, did not find out his sentence when he arrived at the Department of Corrections to serve his sentence. He knew because it was mentioned in his presence several times in open court. He most certainly knew when the trial court imposed a sentence of "life without the possibility of probation or parole." These facts alone support the denial of Ground Fifteen. Accordingly, the Court denies Ground Fifteen.

In addition, although only Petitioner possesses the essential facts, he does not explain why he did not raise the issue with the trial court after being sentenced, why he did not include this claim in his *pro se* motion for post-conviction relief, whether he told appointed counsel about this claim when she prepared the amended motion for post-conviction relief, and whether he told appointed counsel about the claim when she prepared the appeal from the motion court's denial of the amended motion for post-conviction relief. Regarding the latter issues, it is unclear how Petitioner's post-conviction counsel was ineffective, as he alleges, if post-conviction counsel was possibly, if not likely, unaware of the claim.[12] Thus, the Court finds Petitioner fails to establish the performance prong of *Strickland* with regard to, at least, his post-conviction counsel. For this additional reason, Ground Fifteen is denied.

### (h)     Ground Sixteen: Asking for Mistrial

Petitioner argues his trial counsel was ineffective when he failed to request a mistrial after three of the State's witnesses – Natalie Arnold, Judith Hinkle, and Jaime

---

[12] Petitioner argues an evidentiary hearing is necessary because the claim is undeveloped, and his post-conviction and trial counsel can testify as to the advice they provided him. Doc. #26, at 38. But that argument ignores the knowledge he possesses (but fails to provide) and does not demonstrate his post-conviction counsel was ineffective.

Carter – were observed discussing their testimonies and comparing notes. Arnold, Hinkle, and Carter were visited by the Missouri Highway Patrol at J.L.'s school. The witnesses were in one room and worked on their statements together. During trial, Petitioner's sister observed these witnesses discussing their testimonies and comparing notes. Petitioner claims a reasonably competent trial counsel would have moved for a mistrial. He contends "there is a reasonable probability that the outcome of the trial would have been different." Doc. #3, at 51. Petitioner points to the witnesses' testimonies regarding his son's absences from school being incorrect. He asserted this claim before the motion court but abandoned it on appeal. Thus, this claim is defaulted.

Even so, the motion court found Arnold, Hinkle, and Carter conversed on the morning of the third day of trial. Doc. #17-7, at 310. But their conversation was general and did not involve their testimonies other than a question about the date on which J.L. returned to school in January 2012. *Id.* Once Petitioner's sister approached them, the witnesses stopped talking. *Id.* The general conversation occurred before the witnesses testified, and the witnesses testified in immediate succession, eliminating an opportunity for them to discuss their testimonies. *Id.* at 324.

Upon review of the record, the Court finds Petitioner has not shown his trial counsel's performance was "so deficient as to fall below an objective standard of reasonable competence." *Nave*, 62 F.3d at 1035. Further, his speculation that the trial outcome would have been different does not satisfy *Strickland*. *Sanders*, 875 F.2d at 210. Because Petitioner does not demonstrate his counsel's performance was deficient and that he was prejudiced, Ground Sixteen is denied.[13]

## IV. CERTIFICATE OF APPEALABILITY

In order to appeal, Petitioner must obtain a Certificate of Appealability, which should be issued only if he "has made a substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This showing is established if reasonable jurists could disagree as to how the issue should be resolved. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). The Court does not believe that the issues Petitioner has raised

---

[13] *See supra*, n.4.

are subject to debate among reasonable jurists, so the Court declines to issue a Certificate of Appealability.

## V.    CONCLUSION

For the foregoing reasons, Petitioner's Amended Petition for Writ of Habeas Corpus is denied, the Court declines to issue a certificate of appealability, and this matter is dismissed with prejudice.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
DATE: October 23, 2019                    ORTRIE D. SMITH, SENIOR JUDGE
                                          UNITED STATES DISTRICT COURT